B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET (Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER (Court Use Only) |
|---|---|

| PLAINTIFFS   Christopher Steward<br>Eileen Steward | DEFENDANTS   James Francis Whooley |
|---|---|

| ATTORNEYS (Firm Name, Address, and Telephone No.)<br>Matthew N.Kane (BBO #636801)<br>Donnelly, Conroy & Gelhaar, LLP<br>260 Franklin St.,Boston, MA 02110 617-720-2880 | ATTORNEYS (If Known)<br>Thomas O'Donnell<br>Regan Associates, 45 School St.<br>Boston, MA 02108   617-367-1100 |
|---|---|

| PARTY (Check One Box Only)<br>☐ Debtor   ☐ U.S. Trustee/Bankruptcy Admin<br>☒ Creditor   ☐ Other<br>☐ Trustee | PARTY (Check One Box Only)<br>☒ Debtor   ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor   ☐ Other<br>☐ Trustee |
|---|---|

CAUSE OF ACTION (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

**The plaintiffs broughta state court action againstdefendant for breach ofcontract, breach of the covenant of good faith and fair dealing, and unjustenrichment arising from an agreementto renovate and sell a house owned by the defendant.**

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
☐ 11-Recovery of money/property - §542 turnover of property
☐ 12-Recovery of money/property - §547 preference
☐ 13-Recovery of money/property - §548 fraudulent transfer
☐ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner – §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

(continued next column)

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☐ 71-Injunctive relief – imposition of stay
☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☐ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☒ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa et.seq.
☐ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

U.S. BANKRUPTCY COURT
2018 DEC -3 P 4: 21

| ☐ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☒ Check if a jury trial is demanded in complaint | Demand $ 500,184 |

Other Relief Sought

B1040 (FORM 1040) (12/15)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>    James Francis Whooley | BANKRUPTCY CASE NO.<br>    18-13890-FJB | |
| DISTRICT IN WHICH CASE IS PENDING<br>    Massachusetts | DIVISION OFFICE<br>    Boston | NAME OF JUDGE<br>    FJB |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | | |
| DATE | PRINT NAME OF ATTORNEY (OR PLAINTIFF) | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs and Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party.** Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS (BOSTON)

|  |  |
|---|---|
| IN RE: | ) |
|  | ) |
| JAMES FRANCIS WHOOLEY, | )  Case No. 18-13890-FJB |
|  | ) |
| DEBTOR. | ) |
|  | ) |
| CHRISTOPHER STEWARD and | ) |
| EILEEN STEWARD, | ) |
|  | ) |
| v. | )  Adv. Pro. No. _____ |
|  | )  **Removed from Superior Court** |
| JAMES FRANCIS WHOOLEY, | )  **Plymouth, ss.** |
|  | )  **Civil Action No. 1683CV-1180** |

### NOTICE OF REMOVAL

Pursuant to 28 U.S.C. §§ 1334(b), 1441, 1452(a) and Rule 9027 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"), Christopher Steward and Eileen Steward, (the

"Stewards") give notice of removal of the above-styled action from the Massachusetts Superior

Court, Plymouth County, Civil Action Number 1683CV-1180 (the "Massachusetts Action") to

the United States Bankruptcy Court for the District of Massachusetts.

As set forth below, this Court has jurisdiction over the Massachusetts Action under 28

U.S.C. § 1334(b) based on James Whooley's ("Whooley's") pending Chapter 7 bankruptcy

proceeding.  This Court also has federal question jurisdiction over the Massachusetts Action

under 28 U.S.C. § 1331 because the claims alleged on the Massachusetts Action relate to a case

under the Bankruptcy Code; the Massachusetts Action will have a direct and immediate effect on

the debtor, the debtor's Chapter 7 case, and the administration of his estate.

In addition, and as set forth below, Whooley filed for Chapter 7 bankruptcy protection on the eve of trial in the Massachusetts Action.  For two years, the case proceeded through discovery, summary judgment and pretrial proceedings.  As a result, the case is ripe for a prompt adjudication in this Court.

## BACKGROUND

### A.  The Agreement and Whooley's Breaches

1.      The Stewards and Whooley entered into a contract captioned, "Investment Agreement" ("Agreement") dated April 16, 2014.[1]

2.      The purpose of the Agreement was for the Stewards to loan money to Whooley to renovate and sell the property located at 890 Webster Street, Marshfield, Massachusetts ("the Premises").  Among other things, the Agreement provides, "In this Agreement the [Stewards] agree to lend [Whooley] the funds to repair his property at 890 Webster Street, Marshfield, MA and ready said property for sale at which point [Whooley] will repay the [Stewards] all monies invested plus 20% of the total monies lent as an agreed fee for this service."  (Agreement, Preamble).

3.      In the event that the Premises did not initially sell, the parties agreed, "If the Home does not sell within 60 days of coming on the market [the Stewards] agree to rent the Home, when completed, in the amount of $1,800 per (plus utilities) until the home sells." (Agreement  ¶5).

4.      To ensure that the Premises ultimately sold, Whooley agreed to accept all reasonable offers on the Property: "Homeowner agrees to accept all reasonable offers. Reasonable pricing for home will be based on current market conditions and recent sales activity in the area."  (Agreement ¶6).

---

[1]  The Investment Agreement is attached as Exhibit A to the Complaint, attached hereto as Exhibit 1.

5.      The Stewards performed as agreed; they loaned Whooley more than $226,000 to renovate the Property, including a new kitchen, new electric, new bathroom and new HVAC system, among other things.  In addition, they paid several months of his mortgage payments.

6.      Whooley, on the other hand, breached the Agreement in at least four separate respects:

    a.  <u>First</u>, although Whooley listed the property for approximately seven weeks, from October 7, 2014 to November 26, 2014, he refused to market or sell the Property at anytime thereafter.  He instead remained in the home, enjoying all the benefits of the renovations financed by the Stewards without paying back a single penny.

    b.  <u>Second</u>, when the Property did not initially sell, Whooley refused to rent the Property to the Stewards, as required by the Agreement.

    c.  <u>Third</u>, Whooley refused to accept the Stewards' reasonable offer to purchase the Property in March 2015.  When it became clear to the Stewards that Whooley would not market or rent the Property, the Stewards made him an offer in well in excess of the Property's valuation.  Although the Agreement required Whooley to "accept all reasonable offers," he refused to accept the Stewards' offer in breach of the Agreement and continued to reside in the Premises.

    d.  <u>Fourth</u>, during the unsuccessful negotiations to buy the Premises, Whooley demanded that the Stewards pay even more money, including the back-taxes on the property.  The existence of the back-taxes constituted a plain breach of

Whooley's representation in the Agreement that, beyond the mortgage, "there are no liens or encumbrances on the property."

7.    Today, Whooley continues to reside in the renovated Premises—enjoying all of the fruits of the Stewards' loan without making any attempt to pay them back.

8.    At the same time, Whooley has rented out an apartment at the Premises, collecting tens-of-thousands of dollars in rent (which was not accurately disclosed on his schedules before this Court).

9.    If Whooley had sold the Premises to the Stewards for a reasonable offer (as he was contractually obligated to do), then the Stewards would have collected these rents as well as rent for the unit in which Whooley has resided rent-free.

10.    As a result, the Stewards damages include: (i) $226,544 advanced to renovate the Premises under the Agreement; (ii) $133,300 in lost rent for the two units at the Premises; and (iii) statutory interest of more than $140,000.[2] The total claimed damages amounts to more than $500,000.

## B.    The Massachusetts Action

11.    On December 9, 2016 the Stewards commenced the Massachusetts Action seeking the recovery of damages from Whooley. The Complaint asserts claims of breach of contract, breach of the covenant of good faith and fair dealing and unjust enrichment against Whooley. (*See* Exh. 1).

12.    On January 17, 2017, Whooley, answered the Complaint and asserted counterclaims for breach of contracts and fraud against the Stewards.

---

[2]   These damages were set forth in a supplemental interrogatory response set forth in a letter, dated September 19, 2018, attached hereto as Exhibit 2.

13.     The Massachusetts Action progressed through discovery over the course of the following eleven months.

14.     On December 5, 2017, the Stewards moved for summary judgment on all three counts of their Complaint and for dismissal of Whooley's counterclaim.  Whooley opposed the motion.

15.     On February 28, 2018, a Massachusetts Superior Court judge heard argument on the motion for summary judgment and denied the motion in a marginal order.

16.     Thereafter, the parties prepared for trial.  In April 2018, the parties submitted a joint final pre-trial report and appeared for a final pretrial conference.  A trial date was set for October 2018 with a series of pre-trial deadlines.

17.     As the trial date approached, the Stewards readied their case in accordance with the schedule set forth at the final pre-trial conference.  Among other things, the Stewards served a *voir dire* motion as well as several subpoenas for trial witnesses.  In addition, the Stewards reviewed documents and identified exhibits for trial.

18.  Trial was scheduled to begin on October 29, 2018.

## C.  The Bankruptcy Petition

19.     On the eve of trial—after nearly *two years* of litigation and just *twelve days* before trial, Whooley filed his petition seeking protection under Chapter 7 ("the Petition") on October 17, 2018.

20.     In the Petition, Whooley confirmed that he is continuing to reside at the Premises. (Form 101 ¶5).

21.    Whooley listed the Stewards as unsecured creditors on his Official Form 106E/F for two claims: a $12,000 "personal loan" (which he listed as undisputed) and a $90,000 "Contract for home improvement" (which he listed as disputed) (Schedule E/F, Lines 4.2, 4.3).

22.    The aggregated $102,000 figure was inaccurate. As Whooley well knows, the Stewards never claimed $102,000 in damages. As set forth in the Complaint, the Whooley's claimed over $226,000 in damages based on renovations and the amounts advanced to pay Whooley's mortgage. (*See* Exh. 1 ¶39).

23.    During discovery, the Stewards learned that Whooley was renting out a portion of the Premises. Accordingly, they amended their damages claim to include the renovation expenses, lost rent, and statutory interest amounting to $500,184.10. (*See* Exh. 2).[3]

## JURISDICTION

24.    As a party, the Stewards have the right to remove the Massachusetts Action to this Court. In particular, 28 U.S.C. § 1452(a) provides, "A party may remove any claim or cause of action in a civil action . . . to the district court for the district where such civil action is pending, if such district court has jurisdiction of such claim or cause of action under section 1334 of this title."

25.    Moreover, the notice is timely within Rule 9027(a)(2) of the Federal Rules of Bankruptcy Procedure. The Petition was filed on October 17, 2018. The present notice is therefore well within the ninety (90) day period for removal.

---

[3] In addition to understating the Stewards' claim, the Petition contains several other false and misleading claims. For example, Whooley does not disclose the existence of a lease that he has at the Premises. (See Form 101, Line 11; Schedule G). In fact, Whooley is leasing a unit at the Premises to a tenant named George Mallett. Based on an Agreement for Judgment filed in March 2014 filed in Housing Court in Plymouth County, Whooley charged $1400 per month to lease this unit. The Petition, however, states that Whooley collects only $400 per month in unspecified rent. Whooley similarly provides an value for the Premises far below the current tax valuation of the Premises. In addition, he claims that his pension from the Teamsters is worthless. The Stewards expect to address these and other inaccuracies at a later stage in these proceedings.

26.    This Court has jurisdiction pursuant to 28 U.S.C. §1334.  Section 1334 grants

United States District Courts original jurisdiction over all civil matters "related to" federal

bankruptcy cases. *See* 28 U.S.C. § 1334(b) ("[T]he district courts shall have original but not

exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to

cases under title 11."); *see also In re Boston Reg'l Med. Ctr., Inc.*, 410 F.3d 100, 105 (1st Cir.

2005) (holding that the bankruptcy court's subject matter jurisdiction extended to claim for truist

corpus because the claim "[would] directly impact" amounts paid to creditors and was therefore

"a matter intimately connected with the efficacy of the bankruptcy proceeding.").[4]

27.    The statutory grant of 'related to' jurisdiction is quite broad. *In re Boston Reg'l*

*Med. Ctr.*, 410 F.3d at 105. "[B]ankruptcy courts ordinarily may exercise related to jurisdiction

as long as the outcome of the litigation 'potentially [could] have some effect on the bankruptcy

estate, such as altering debtor's rights, liabilities, options, or freedom of action, or otherwise have

an impact upon the handling and administration of the bankrupt estate.'" *Id.* (quoting *In re G.S.F.*

*Corp.*, 938 F.2d 1467, 1475 (1st Cir. 1991)) (alteration in original).

28.    Although the Massachusetts Action is not a core proceeding within the meaning

of 28 U.S.C. § 157(b), it is plainly related to Whooley's bankruptcy case and therefore well

within this Court's jurisdiction.  The Stewards have a damages claim against Whooley for

upwards of $500,000.  The Massachusetts Action will therefore have a direct and immediate

impact on Whooley and the administration of his bankruptcy estate.  The outcome of the

Steward's claim will therefore "directly impact" amounts paid to Whooley's remaining creditors

---

[4]  See also *Celotex Corp. v. Edwards*, 514 U.S. 300, 308 (1995) ("Congress intended to grant comprehensive
jurisdiction to the bankruptcy courts so that they might deal efficiently and expeditiously with all matters connected
with the bankruptcy estate.")(quoting *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984)) (construing 28
U.S.C. § 1334(b)).

and constitutes "a matter intimately connected with the efficacy of [Whooley's] bankruptcy proceeding." *In re Boston Reg'l Med. Ctr., Inc.*, 410 F.3d at 105.

29.     As required under Bankruptcy Rule 9027(a)(1) of the Federal Rules of Bankruptcy Procedure, the Stewards state that they consent to entry of final orders or judgments by the bankruptcy judge.

30.     Based on the foregoing, these matters are properly removed pursuant to 28 U.S.C §1452(a) and Bankruptcy Rule 9027.

<u>**NOTICE**</u>

31.     Promptly after filing this notice, the Stewards shall serve a copy of it on all parties to the Massachusetts Action as required by Bankruptcy Rule 9027(b) and file a copy of it with the clerk's office for the Plymouth County Superior Court from which the Massachusetts Action is removed as required by Bankruptcy Rule 9027(c).

32.     Pursuant to Local Rule 9027-1, the Stewards will file a motion to permit the filing of a certified docket and photocopies of all records and proceedings in the Massachusetts Action.

CHRISTOPHER STEWARD
EILEEN STEWARD,

By their attorney,

/s/ Matthew N. Kane

Matthew N. Kane (BBO# 636801)
mnk@dcglaw.com
DONNELLY, CONROY & GELHAAR, LLP
260 Franklin Street, Suite 1600
Boston, Massachusetts 02110
(617) 720-2880

CERTIFICATE OF SERVICE
I hereby certify that on this day a true copy of
the above document was served upon the
attorney of record for each party by mail, by hand
~~and email~~

Date: 12/3/18  /s/ Matthew N. Kane

Dated: December 3, 2018

8

## COMMONWEALTH OF MASSACHUSETTS

PLYMOUTH, SS.                                    SUPERIOR COURT

CHRIS STEWARD and        )
EILEEN STEWARD,          )
                         )
        Plaintiffs,      )
                         )        C.A. No. 1683CV01180
    v.                   )
                         )
JAMES WHOOLEY,           )
                         )
        Defendant.       )
                         )

FILED
COMMONWEALTH OF MASSACHUSETTS
SUPERIOR COURT DEPT. OF THE TRIAL COURT
PLYMOUTH COUNTY

DEC - 9 2016

Clerk of Court

### COMPLAINT

1.      Pursuant to Mass. R. Civ. 8, Plaintiffs Chris Steward and Eileen Steward

(collectively, the "Plaintiffs" or the "Stewards") bring this action seeking one recovery of

damages, attorneys' fees, expenses, and costs incurred as a consequence of James Whooley's

("Defendant" or "Mr. Whooley") breaches of contractual obligations and unjust enrichment. As

described more fully below, Mr. Whooley is in breach of an agreement he made with the

Stewards to place 890 Webster Street, Marshfield, Massachusetts (the "Property") on the market

after receiving over $226,000 in funding from the Stewards to renovate it and has been unjustly

enriched by continuing to live in the Property with the benefit of its improvements.

### THE PARTIES

2.      Chris Steward and Eileen Steward are married individuals who reside in

Plymouth County, Massachusetts.

3.      James Whooley is an individual who resides in Plymouth County, Massachusetts.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this Complaint alleging a civil cause of action

pursuant to G.L. c. 212, § 4. Further, this Court has jurisdiction over the Massachusetts common

law claims brought in this action pursuant to G.L. c. 223A, § 3 and G.L. c. 214, § 1.

5.      The amount in controversy in this action exceeds $25,000, exclusive of interests

and costs.

6.      Plymouth County is the proper venue for this action pursuant to G.L. c. 223, § 1

because Mr. Whooley resides within Plymouth County.

## FACTUAL ALLEGATIONS

**I.        Mr. Whooley and the Property.**

7.      Upon information and belief, Defendant James Whooley is a 50-year-old man

who works as a dockworker for the grocery store Stop and Shop. He previously worked as a

painter and laborer. By virtue of his professional experiences, Mr. Whooley has many friends in

the construction and trade industries, including Adam Hessler, the general contractor who led the

project that is the focus of this lawsuit and who had previously assisted him with renovations on

the Property. Mr. Whooley also has a brother, John Whooley, who is in the construction

business.

8.      In or around September 1998, Mr. Whooley and his then-wife bought the

Property in Marshfield from James and Patricia Reilly, Plaintiff Eileen Steward's parents. The

Property is a three bedroom, two and a half bath, single family home. Upon information and

belief, he and his then-wife moved into the Property soon thereafter.

9.      In or around May 2003, Mr. Whooley recorded a Declaration of Homestead on

the Property as his "principal residence" with the Plymouth County Registry of Deeds.

10.     In or around 2004, Mr. Whooley converted part of the Property into an apartment and began renting it out.

11.     In or around June 2005, Mr. Whooley and his then-wife purchased another home at 8 Liberty Road, Marshfield, Massachusetts. Mr. Whooley and his then-wife moved into the new house. Mr. Whooley never informed the Plymouth County Registry of Deeds that 8 Liberty Road was his new principal residence. Upon information and belief, he also did not so inform all the various mortgagees on both properties.

12.     From 2005 to 2014, Mr. Whooley treated the Property as an investment, and rented both the main house and the apartment to various tenants. To ensure that his investment continued to pay him income, Mr. Whooley repaired and maintained the Property for his tenants as required, all the while living at 8 Liberty Road.

13.     On November 2013, Mr. Whooley divorced his wife, who subsequently deeded her title and interests in the Property to Mr. Whooley as a part of their divorce settlement. Mr. Whooley then moved back to the Property which he had used as an investment property for years.

II.     **The Agreement between the Stewards and Mr. Whooley.**

14.     In or around March 2014, Eileen Steward and James Whooley discussed the prospect of creating a business relationship involving the renovating and selling of properties. The Stewards had never engaged in such a business before. The Stewards recognized, however, that Mr. Whooley had experience in renting properties, as he had done with the Property, and that Mr. Whooley was sophisticated in the costs and timelines related to renovations based upon his tradesman experience and contacts.

3

15.     Extensive conversations were held between Eileen Steward, Mr. Whooley, and general contractor Hessler.  Eventually, Mr. Whooley and the Stewards agreed that their business relationship should begin with the Stewards lending money to Mr. Whooley to fix and sell the Property.

16.     Mr. Whooley was living in the apartment, since the main house needed so much work.  The parties acknowledged that while Mr. Whooley had kept up with repairs and maintenance during the time he was receiving investment income, the Property was in extensive need of updating.  The roof was leaking and needed replacing, plumbing and electrical updates were needed, the porch had partially collapsed and was not safe, and other conditions in the main house made it unsafe to rent or live in during the renovation construction.

17.     With this understanding in mind, on April 16, 2014, the Stewards and Mr. Whooley entered into an agreement (the "Agreement," attached hereto as Exhibit A).

18.     The Agreement stated in pertinent part that "[i]n this Agreement the [Stewards] agree to lend [Mr. Whooley] the funds to repair his property at 890 Webster Street, Marshfield, MA and ready said property for sale at which point [Mr. Whooley] will repay the [Stewards] all monies invested plus 20% of the total monies lent as an agreed fee for this service." *Id.* at Preamble.

19.     Under the Agreement, Mr. Whooley affirmed that he was the sole owner of the Property, that there were not any liens or encumbrances on the Property, and that "[t]he Primary and Secondary loans on the property are in good standing and are to remain in good standing and equate to approximately $180,000 combined payoff amount." *See id.* at ¶¶ 1-3.

13.     The Agreement further stated:

> 4.     [The Stewards] agree to lend $75,000 dollars for repairs on 890 Webster Street.  All project plans, materials and contractors must be approved by

4

[the Stewards] and be licensed and insured. If additional money is necessary upon agreement by the parties, any additional funding will also be paid back at closing at the agreed 20% fee.

5.      Project will have a sixty (60) day completion plan. Home will be placed on the market 30 days after the start of the project (April 21 - start). Contract to sell begins May 16. If the Home does not sell within 60 days of coming on the market [the Stewards] agree to rent the Home, when completed, in the amount of $1800 per (plus utilities) until the home sells. Any changes to this clause will be agreed by parties.

6.      Homeowner agrees to accept all reasonable offers. Reasonable pricing for home will be based on current market conditions and recent sales activity in the area.

20.      On or about April 24, 2014, after the Agreement was signed, Mr. Whooley filed a Certificate for Organization with the Secretary of State for "Dinsdale Real Estate Ventures, LLC." On the Certificate of Organization, Mr. Whooley listed the "general character" of the business as "Financial Services."

21.      Before renovations began, Mr. Whooley and Ms. Steward asked Cindi Ford – a colleague of Ms. Steward's at Boston Connect Real Estate –for an assessment of the Property to help advise on its worth and what repairs and upgrades should be done to obtain a higher price in the current market.

22.      Ms. Ford and her husband, Daryl, came to the Property on April 25, 2014 and assessed the current value at approximately $190,000-$200,000 due to the state of disrepair and the need for both cosmetic upgrades as well as structural repair. This assessment was consistent with an assessment that Mr. Whooley received months earlier concerning the Property in connection with his divorce proceedings.

23.      Ms. Ford told him it would be expensive to renovate the Property, and at that point the parties may see the home sell between $425,000-450,000. Mr. Whooley agreed to use Ms. Ford to be the listing agent and to help sell the Property when the time came, because Ms.

Steward was traveling out of state two weeks out of the month and Ms. Ford could be available to show the property full-time.

### III.    Renovations begin on the Property.

24.     After the Stewards and Mr. Whooley signed the Agreement, the Stewards began forwarding funds to Mr. Whooley to renovate the Property.

25.     First, in or around April 2014, the Stewards and Mr. Whooley worked with Mr. Hessler to repair and renovate the roof and then repair and paint the exterior. The Stewards paid $30,000 for this work.

26.     In or around May 2014, the Stewards and Mr. Whooley worked with Mr. Hessler to repair/renovate the wraparound porch and perform additional outside projects. Drawings were done and presented for the porch which were approved by Mr. Whooley. The Stewards paid $20,000 for this work.

27.     All along, Mr. Whooley and Ms. Steward kept in constant contact about the repairs needed. Mr. Whooley engaged in daily conversations with Mr. Hessler. Mr. Whooley and Ms. Steward also went shopping and purchased many items for the house, such as lighting fixtures and granite for the kitchen. Receipts and plans were shared amongst the parties.

28.     Most weeks, Mr. Whooley, Mr. Hessler, and Ms. Steward would meet to review what work had been performed and what material and labor expenses were incurred. Mr. Hessler also kept a detailed notebook of the expenses for material and labor, and carried it with him both on site, and at the weekly meetings. At the conclusion of most of these meetings, Ms. Steward would write a check to Mr. Hessler with Mr. Whooley present.

29.     Mr. Whooley had access to Mr. Hessler's notebook and spoke often and freely

with Mr. Hessler about all projects.  Mr. Whooley also requested that his brother, John Whooley,

be utilized to work on renovation of the Property.

30.     In or around June 2014, both the Stewards and Mr. Whooley realized that more

than $75,000 was needed to renovate the Property for sale per the Agreement.  For example, the

town of Marshfield required new electrical wiring for the entire house to bring it to code, and a

completely new heating system needed to be installed.

31.     Mr. Whooley and the Stewards agreed that the parties should finish the

renovations to make the Property marketable, and that pursuant to the existing terms of the

Agreement, particularly Section 4, further funds were required.  Per the Agreement, Mr.

Whooley promised once again that he would pay back all the monies borrowed with applicable

interest at the sale of the house.

32.     Thereafter, the Stewards provided additional funds to finish current projects and

repair other items.  Attached hereto as Exhibit B is a schedule of the payments made by the

Stewards to fund the renovation.

33.     The Stewards also lent additional monies to Mr. Whooley, specifically $2,000

per month so that Mr. Whooley could make his mortgage payments during the renovation.  The

parties agreed that these additional monies would be included as part of the costs incurred on the

renovation project, and therefore to be paid back in full with interest from the proceeds of the

sale of the house.

34.     Throughout the renovation, including after it was decided that funds above the

initial $75,000 were necessary, Ms. Steward and Mr. Whooley met many times, and kept each

other updated on project needs and progress.

35.     In addition, because Mr. Whooley lived in the apartment on the Property, at all relevant times Mr. Whooley could see in real-time—in a way that the Stewards could not—all the work that was being done to the Property and his friend Mr. Hessler's oversight of the work. Mr. Whooley also had ample opportunity, and upon information and belief took advantage of that opportunity, to discuss the progress of the renovation with various onsite construction contractors, including Mr. Hessler.

36.     As part of the renovation of the Property, the Stewards also agreed to let Mr. Whooley's family and friends conduct much of the renovation (and thereby receive the Stewards' funds). Mr. Whooley's brother, John Whooley, and Adam Hessler did the majority of the work, but they were two of several persons whom Mr. Whooley knew and who were working on the Property.

37.     In or around August 2014, John Whooley, Mr. Whooley's brother, was attempting to level the side yard for the planting of trees. However, John Whooley drove his front loader into a pond behind the house which had to then be messily extracted. In addition, Mr. Whooley either used himself, or directed someone else on-site to use, a digger to dig around the pond area. These actions separately and cumulatively damaged a protected wetland area. The Stewards had previously warned Mr. Whooley not to alter the pond area because of these risks.

38.     The Town of Marshfield learned about the wetlands damage in or around August 2014. On October 20, 2014, the town entered an enforcement order against Mr. Whooley for his actions in "altering wetland and riverfront without a permit—Excavating and clearing bordering vegetated wetland riverfront area." It was subsequently determined that it would cost thousands of dollars to comply with the needed remediation plan.

**III.   The Property fails to sell and Mr. Whooley deeds a portion of the Property to his wholly-owned separate venture.**

39.     The Stewards ultimately expended $226,355 to fund renovations to the Property.

40.     The parties agreed to put the Property on the market in September 2014.  As agreed, the listing agent was Cindi Ford of Boston Connect Real Estate whom had initially come to see and advise about the Property.  Ms. Steward and Ms. Ford suggested that the price be $499,000 with a price break after two weeks if there was no offer.  Mr. Whooley refused and insisted that the Property be listed at $540,000.  The Stewards agreed to have Ms. Ford list the property at $540,000 per Mr. Whooley's insistence.

41.     The Property unfortunately did not sell, and it was agreed by all parties that it would be taken off the market for the winter 2014-2015 months, and put back on the market during the spring of 2015.

42.     On December 5, 2014, Mr. Whooley deeded "a portion of the premises" [the Property] to Dinsdale Real Estate Ventures, LLC, for the sum of "less than $100." *See* Quitclaim Deed, Book 45018, Page 286, *available at* the Plymouth Registry of Deeds.  While Mr. Whooley had previously expressed an interest to open up a coffee shop on this portion of the Property, Mr. Whooley had long agreed that the sale of the Property would include all the parcels of the Property, including the portion he deeded to his wholly owned limited liability company.  His actions added another obstacle to the successful sale of the Property.

**IV.   The Property appraisal falls short of expectations and Mr. Whooley fails to abide by the Agreement.**

43.     On or about February 14, 2015, the Property, including the portion that had been deeded by Mr. Whooley to himself, was appraised at $410,000.  The company that conducted the

9

appraisal, Performance Appraisal Services, had no relationship to the Stewards, and had been

recommended by Sharon McNamara, the owner of Boston Connect Real Estate.

44.     Both Mr. Whooley and the Stewards were surprised that the Property had been

appraised at such a low level.  Mr. Whooley and the Stewards learned that the Property had been

appraised at such a low value because (1) unbeknownst to either party, the Property had lost its

zoning as a commercial property, and (2) it did not have a legal second (apartment) unit: during

Mr. Whooley's 2004 renovations he received a building permit to change the previous structure

into an apartment, but Mr. Whooley did not file for rezoning.  The appraiser stated that, with

proper zoning, the Property would have been worth approximately $20,000-$25,000 more.

(Both the appraiser and Ms. Steward told Mr. Whooley to file for rezoning with the town, but

Mr. Whooley ignored this request, and upon information and belief is improperly renting the

apartment presently).

45.     After the appraisal was received, Mr. Whooley did not list the Property for sale,

which was the ultimate goal of the Agreement between the Stewards and Mr. Whooley.

46.     In January 2015, Mr. Whooley said he was ready for the Stewards to rent the

Property pursuant to paragraph 5 of the Agreement.  This provision was in the Agreement to help

mitigate risk should the Property not sell in a reasonable time frame.  The Stewards agreed, and

asked Mr. Whooley to move out so they could move in, but Mr. Whooley subsequently refused

to move out, and instead sought to continue borrowing $2,000 per month from the Stewards to

assist in his mortgage payments.

47.     Finally, Mr. Whooley failed to accept any reasonable offers pursuant to Section

6 of the Agreement.  In fact, he repudiated an offer that he had previously accepted.

48.     On February 16, 2015, the Stewards, looking to recoup what they had lent after

the low appraisal, engaged in a series of text messages with Mr. Whooley. In these

communications, Mr. Whooley agreed that he would sell the Property to the Stewards in return

for the value of $525,626:

Eileen Steward:

Let's meet for breakfast this week. I should have the [Appraisal] report and hopefully
have some info from the town on the zoning. Wednesday morning? Fitzy's?

James Whooley:

I only see 2 ways out of this, neither of which involves a refinance, the house doesn't
appraise for enough to avoid pmi, with or without zoning, this project has 210 of your
money and 100 original equity, plus 14 of my cash in it, but, sadly is only worth what I
owe, plus what I owe you leaving a 100 deficit, which I am willing to take a loss on, but
NOT the entire loss, if you two wish to buy this place, I will agree to take 75, roughly 39
short of what I put in, or 1/3 total deficit of the project, short of what I intend to rent this
place March 1st and continue working on it as this place was never completed, and still
needs 20 worth of work, when it's done, it may be worth selling so all of us could break
even or reduce the total deficit, over time I may be able to get a mortgage, but none of
that will happen anytime soon, so you two need to decide which way you we're gonna go

Eileen Steward:

I'll pay the loan off plus the $75,000...What choice do I have? I'll close as SOON as
possible.
Deal?

James Whooley:

Deal

*Id.* (attached hereto as Exhibit C).

49.     Thus, the sale agreement consisted of a direct cash payment to Mr. Whooley of

$75,000 plus the total of the payoff amounts on the mortgage and equity line of credit that Mr.

Whooley had on the Property ($180,000, as affirmed by Mr. Whooley in section 3 of the

Agreement), and the complete forgiveness of the debt pursuant to the Agreement ($226,355 plus a 20% fee of $45,271 pursuant to Section 4 of the Agreement).

50.     The value of $525,626 approximated the Fall 2014 listing price of $540,000, and represented the Stewards' belief in the true value of the current state of the Property.

51.     To formalize the parties' sale agreement, a written offer was sent to Mr. Whooley on March 20, 2015 which corresponded to these terms. The offer also included a provision that Mr. Whooley would place monies in escrow for the rehabilitation of the wetlands whose destruction occurred at the hands of his brother, John Whooley. The offer also required that Mr. Whooley accept a companion offer for $100 to purchase the plot of land that Mr. Whooley had secretly deeded to his separate real estate venture.

52.     Despite Mr. Whooley's agreement to sell the Property to the Stewards through the text messages, Mr. Whooley refused the offer. Instead, Mr. Whooley engaged counsel to counter the Stewards' offer, and through counsel demanded that the Stewards pay in addition: (a) Mr. Whooley's back taxes on the Property (an encumbrance that he did not disclose pursuant to Section 2 of the Agreement); (b) his closing costs; and (c) his costs for the restoration of the riverfront and wetlands that he had a hand in damaging.

53.     The Stewards were then forced to engage undersigned counsel to negotiate a modification of the agreements previously made between them and Mr. Whooley. Those negotiations were unsuccessful, as Mr. Whooley persistently refused to comply with any terms of the Agreement, despite being a sophisticated tradesman, who was continuously present at, aware of, updated on, and participated in the renovation of the Property.

54.     And to this day, over one year later, Mr. Whooley continues to live at 890 Webster Street, taking free advantage of a completely remodeled and renovated home, with new

hardwood floors throughout, custom cabinets in the kitchen, granite countertops, a center island, all new stainless steel appliances, first floor laundry, central air conditioning, and a restored apartment/in-law suite.

## CAUSES OF ACTION

### COUNT I
### (Breach of Contract)

55.     Plaintiffs repeat and incorporate by reference all of the preceding allegations.

56.     Plaintiffs and Mr. Whooley entered into a valid, binding and enforceable agreement.

57.     Plaintiffs performed their obligations under the parties' agreement.

58.     As alleged in detail above, Mr. Whooley breached the parties' agreement by, without limitation, failing to ready the Property and list it for sale, failing to accept all reasonable offers for the Property, failing to rent the Property to the Plaintiffs when the Property did not sell, and failing to pay sums due and owing under the agreement.

59.     Plaintiffs have suffered and continue to suffer damages arising from Mr. Whooley's breaches, including the loss of their original loan to ($226,354.88), agreed upon fees ($45,270.98), and other damages caused by Mr. Whooley and his agents to the Property.

### COUNT II
### (Breach of the Covenant of Good Faith and Fair Dealing)

60.     Plaintiffs repeat and incorporate by reference all of the preceding allegations.

61.     Implicit in every contract is a promise of good faith and fair dealing.

62.     Mr. Whooley acted inconsistently with the justified expectations of Plaintiffs under the Agreement by, *inter alia*, refusing to abide by the terms of the agreement despite receipt of hundreds of thousands of dollars from the Plaintiff.

63.     In so doing, Mr. Whooley destroyed the rights of Plaintiffs to receive the fruits of the agreement.

64.     Plaintiffs have suffered and continue to suffer damages arising from Mr. Whooley's breaches.

## COUNT III
### (Unjust Enrichment)

65.     Plaintiffs repeat and incorporate by reference all of the preceding allegations.

66.     Mr. Whooley has received benefits by receiving and retaining over $220,000 in renovation benefits to the Property he lives in without abiding by the terms of the agreement.

67.     Mr. Whooley had and has knowledge of the benefit of monies paid to him.

68.     Retention by Mr. Whooley of these benefits under such circumstances is inequitable.

69.     The Plaintiffs are entitled to an award of damages equal to all monies unjustly received by Mr. Whooley as a result of his wrongful conduct.

## REQUESTS FOR RELIEF

Plaintiffs respectfully request the Court enter the following relief:

a.     On Count I of the Complaint, award Plaintiffs their damages;

b.     On Count II of the Complaint, award Plaintiffs their damages;

c.     On Count III of the Complaint, award Plaintiffs their damages;

d.     Award Plaintiffs prejudgment interest and post-judgment interest at the statutory rate;

e.     Award Plaintiffs their reasonable attorneys' fees and costs; and

f.     Award Plaintiffs such other and further relief as the Court deems just.

14

## JURY DEMAND

Plaintiffs request a trial by jury on all claims so triable.

CHRIS STEWARD and
EILEEN STEWARD,

By their attorneys,

Matthew N. Kane (BBO# 636801)
mnk@dcglaw.com
Brendan T. St. Amant (BBO# 672619)
bts@dcglaw.com
DONNELLY, CONROY & GELHAAR, LLP
260 Franklin Street, Suite 1600
Boston, Massachusetts 02110
(617) 720-2880

Dated: December 8, 2016

# Exhibit A

## INVESTMENT AGREEMENT

This is an Agreement between Eileen and Christopher Steward (INVESTORS) and James Whooley (HOMEOWNER) dated this 16th Day of April, 2014. In this Agreement the INVESTORS agrees to lend the HOMEOWNER the funds to repair his property at 890 Webster Street, Marshfield, MA and ready said property for sale at which point HOMEOWNER will repay the INVESTORS all monies invested plus 20% of the total monies lent as an agreed fee for this service. In addition, upon completion of the repairs Eileen Steward (REALTOR) will act as listing agent on the property through her Real Estate office Boston Connect Real Estate located in Pembroke, MA.

1. James Whooley is the sole owner of the property and as a result of the Separation and Divorce Agreement attached as evidence hereto. He affirms that all conditions were met to secure this property as agreed in the aforementioned document and that a new deed was filed in his name only A copy of which is attached hereto.

2. That there are no liens or encumbrances on the property.

3. The Primary and Secondary loans on the property are in good standing and are to remain in good standing and equate to approximately $180,000 combined payoff amount.

4. INVESTORS agree to lend $75,000 dollars for repairs on 890 Webster Street. All project plans, materials and contractors must be approved by INVESTORS and be licensed and insured. If additional money is necessary upon agreement by the parties, any additional funding will also be paid back at closing at the agreed 20% fee.

5. Project will have a sixty (60) day completion plan. Home will be placed on the market 30 days after the start of the project (April 21 – start). Contract to sell begins May 16. If the Home does not sell within 60 days of coming on the market INVESTORS agree to rent the Home, when completed, in the amount of $1800 per (plus utilities) until the home sells. Any changes to this clause will be agreed by parties.

6. HOMEOWNER agrees to accept all reasonable offers. Reasonable pricing for home will be based on current market conditions and recent sales activity in the area.

Signed this __16__ day of April, 2014.


_Eileen Steward_          _Christopher Steward_                    _James Whooley_

Eileen Steward          Christopher Steward                    James Whooley

# Exhibit B

**Expenses for Renovation of 890 Webster Street**

| Checks written for Renovation Project from the joint Checking Account | | | |
|---|---|---|---|
| Date | Check # | Amount | To |
| 1.09 | 3162 | $2,000 | James Whooley |
| 12.10 | 3159 | $2,000 | James Whooley |
| 11.18 | 3158 | $2,000 | James Whooley |
| 11.05 | 3135 | $1,095 | Adam Hessler |
| 10.29 | 3133 | $669 | Adam Hessler |
| 10.25 | 3134 | $741 | Kevin Powell |
| 10.17 | 3160 | $2,908 | Paul Archer |
| 10.17 | 3157 | $3,248 | Adam Hessler |
| 10.17 | 3325 | $2,000 | James Whooley |
| 10.14 | 3322 | $1,725 | John DiBeneditto |
| 10.9 | 3321 | $925 | John DeBeneditto |
| 10.9 | 3323 | $7,554 | Adam Hessler |
| 10.3 | 3320 | $3,972 | Adam Hessler |
| 9.26 | 3155 | $4,400 | Adam Hessler |
| 9.25 | 3301 | $525 | Joe Malloy |
| 9.22 | 3300 | $2,742 | Adam Hessler |
| 9.12 | 3296 | $2,900 | Paul Archer |
| 9.12 | 3295 | $2,000 | James Whooley |
| 9.12 | 3297 | $4,746 | Adam Hessler |
| 9.5 | 3151 | $4,000 | Paul Archer |
| 9.5 | 3152 | $2,100 | Rob Dimery |
| 9.5 | 3153 | $4,364 | Adam Hessler |
| 8.29 | 3317 | $2,400 | Ron Dunn |
| 8.28 | 3318 | $5,811 | Adam Hessler |
| 8.19 | 3316 | $2,000 | James Whooley |
| 8.15 | 3315 | $2,749 | Adam Hessler |
| 8.8 | 3290 | $2,941 | Adam Hessler |
| 8.4 | 3064 | $4,130 | Adam Hessler |
| 8.4 | 3067 | $5,000 | Jarrod Fosberg |
| 7.25 | 3062 | $4,500 | Jarrod Fosberg |
| 7.24 | 3061 | $2,000 | James Whooley |
| 7.24 | 3063 | $1,533 | Adam Hessler |
| 7.18 | 3057 | $2,650. | Rob Dimery |
| 7.11 | 3059 | $1,300 | Adam Hessler |
| 7.11 | 3056 | $3,000 | Jarrod Fosberg |
| 7.7 | 3053 | $4,200 | Sawhorse |
| 7.3 | 3121 | $1,665 | Adam Hessler |
| 6.30 | ---- | $350 | Noon Turf Care |

## Expenses for Renovation of 890 Webster Street

| 6.26 | 3149 | $4,600 | Adam Hessler |
|---|---|---|---|
| 6.26 | 3148 | $7,300 | Robert Dimery |
| 6.20 | 3147 | $3,520 | Adam Hessler |
| 6.13 | 3120 | $5,535 | Adam Hessler |
| 6.5 | 3050 | $3,357 | Adam Hessler |
| 6.2 | 3051 | $525 | Joe Malloy |
| 5.30 | 3054 | $2,000 | James Whooley |
| 5.30 | 3052 | $4,400 | Adam Hessler |
| 5.23 | 3119 | $3,050 | Payroll (I cashed a check for cash for Adam because he needed it ASAP) |
| 5.14 | 3113 | $3,000 | Sawhorse |
| 5.9 | 3111 | $3,095 | Adam Hessler |
| 5.2 | 3112 | $5,000 | Sawhorse |
| 5.2 | 3114 | $3,161 | Adam Hessler |
| 4.30 | 3110 | $525 | Malloy Waste |
| 4.27 | 3107 | $245 | Sawhorse |
| 4.24 | 3102 | $2,500 | Adam Hessler |
| 423 | 3109 | $4,500 | Sawhorse |
| 4.18 | 3101 | $1,445 | Adam Hessler |
| | TOTAL CHECKS | **$162,601** | |

| | | | |
|---|---|---|---|
| 5.23 | $422.88 | | Lowe's |
| 5.22 | $808.88 | | Sherwin Williams |
| 4.17 | $364.25 | | John Foster Lumber |
| | Total This Account | | **$1,596.01** |
| | | | |

| | | |
|---|---|---|
| 7.25 | Hanover Landscaping | $165.59 |
| 7.24 | Lowe's | $58.14 |
| 7.24 | Lamberts | $48.83 |
| 7.12 | Brockton Furnace | $5,575.49 |
| 7.10 | Lamberts | $491 |
| 7.8 | Home Depot | $55.04 |
| 7.8 | Home Depot | $16.79 |
| 7.1 | John Foster Lumber | $63.08 |

## Expenses for Renovation of 890 Webster Street

| | | |
|---|---|---|
| 6.26 | John Foster Lumber | $247.38 |
| 6.23 | John Foster Lumber | $24.47 |
| 6.21 | John Foster Lumber | $238.42 |
| 6.19 | John Foster Lumber | $421.53 |
| 6.13 | Sherwin Williams | $182.18 |
| 6.12 | Lowe's | $615.10 |
| 6.9 | John Foster Lumber | $793.16 |
| 6.5 | August West Chimney Co. | $3,621.19 |
| 6.2 | John Foster Lumber | $1,033.92 |
| 5.30 | Light and Leisure | $2,036.72 |
| 5.27 | John Foster Lumber | $909.54 |
| 5.17 | John Foster Lumber | $1,049.20 |
| 5.15 | Home Depot | $370.81 |
| 5.12 | Home Depot | $1,574.36 |
| 5.12 | Home Deport | $3,027.03 |
| 5.12 | Home Depot | $5,017.70 |
| 5.12 | John Foster Lumber | $879.70 |
| 5.10 | John Foster Lumber | $1,001.93 |
| 5.9 | John Foster Lumber | $237.84 |
| 5.9 | John Foster Lumber | $1,682.52 |
| 5.8 | John Foster Lumber | $844.30 |
| 4.30 | Home Depot | $1,247.31 |
| 4.24 | John Foster Lumber | $650.95 |
| 4.23 | John Foster Lumber | $649.78 |
| 4.23 | John Foster Lumber | $126.67 |
| 4.21 | Home Depot | $405.55 |
| 4.21 | John Foster Lumber | $34.09 |
| 4.21 | John Foster Lumber | $40.27 |
| 4.19 | Home Depot | $4,420 |
| | TOTAL THIS CARD | **$39,857.58** |
| | | |
| | | |

| | | |
|---|---|---|
| 4.24 | Taylor Lumber | $132.00 |
| 7.16 | P.A. Landers | $289.00 |
| 7.15 | P.A. Landers | $446.25 |
| 7.12 | P.A. Landers | $533.38 |
| 7.11 | Taylor Lumber | $935 |
| 7.9 | P.A. Landers | $295 |
| 7.5 | Home Depot | $79.14 |
| 6.23 | Lowe's | $38.25 |

**Expenses for Renovation of 890 Webster Street**

| 9.10 | Lowe's | $3,812.48 |
|---|---|---|
| 9.20 | Lowe's | $1,658.66 |
| 9.30 | Lowe's | $382.51 |
| 9.30 | Lowe's | $1,009.33 |
| 10.4 | Lowe's | $1,115.70 |
| 10.7 | Sherwin Williams | $19.33 |
| 10.8 | Hanover Glass | $71.91 |
| 10.23 | Lowe's | $408.20 |
| 10.24 | Sherwin Williams | $53.38 |
| | TOTAL THIS CARD | **$11,279.52** |

| Renovation Purchases using Bank of America  - Joint Credit Card | | |
|---|---|---|
| 10.16 | Direct Granite | $3,108.77 |
| 10.7 | Direct Granite | $1,642.19 |
| 9.17 | Direct Granite | $3,108.78 |
| 10.6 | Light & Leisure | $63.74 |
| 10.6 | Sherwin Williams | $62.05 |
| 10.6 | Lowe's | $156.03 |
| 9.16 | Sherwin Williams | $273.00 |
| 9.30 | Light & Leisure | $175.28 |
| 9.12 | Sherwin Williams | $273 |
| 8.16 | National lumber | $2,159.03 |
| | TOTAL THIS CARD | **$11,021.87** |

# TOTAL $226,354.88

# Exhibit C

## Text Message
### Feb 16, 2015, 9:15 AM

Let's meet for breakfast this week. I should have the report and hopefully you'll have some info from the town on the zoning. Wednesday morning? Fitzy's?

I only see 2 ways out of this, neither of which involves a refinance, the house doesn't appraise for enough to avoid pmi, with or without the zoning, this project has 210 of your money and 100 of original equity, plus 14 of my cash in it, but, sadly is only

enough to avoid pmi, with or without the zoning, this project has 210 of your money and 100 of original equity, plus 14 of my cash in it, but, sadly is only worth what I owe, plus what I owe you, leaving a 100 deficit, which I am willing to take a loss on, but NOT the entire loss, if you two wish to buy this place, I will agree to take 75, roughly 39 short of what I put in, or 1/3 the total deficit of the project, short of that I intend to rent this place March 1st and continue working on it as this place was never

when it's done, it may be worth selling so all of us could break even or reduce the total deficit, over time I may be able to get a mortgage, but none of that will happen anytime soon, so you two need to decide which way we're gonna go

I'll pay the loan off plus the $75,000... What choice do I have? I'll close as SOON as possibly. Deal?

Deal



Donnelly, Conroy & Gelhaar, LLP
260 Franklin Street, Suite 1600
Boston, MA 02110
617.720.2880 ph.
617.720.3554 fx.
www.dcglaw.com

Matthew N. Kane
mnk@dcglaw.com

September 19, 2018

**BY HAND**

Thomas F. O'Donnell, Esq.
Regan Associates, Chartered
45 School Street, 3rd Floor
Boston, MA 02108

Re:  Chris Steward and Eileen Steward v. James Whooley,
Plymouth Superior Court, Civil Action No. 1683CV01180

Dear Mr. O'Donnell:

I write to supplement the Joint Pretrial Report with respect to: (i) Itemization of Special or Liquidated Damages; and (ii) Witnesses. In addition, we ask that you immediately supplement your client's document production or confirm, in writing, that he has produced all responsive non-privileged documents in his possession, custody or control.

**A.  Itemization of Damages**

We recently received Housing Court records demonstrating that Mr. Whooley had been renting out two units at 890 Webster Street immediately before the Stewards advanced the money at issue in our case. In particular, Mr. Whooley was renting out Unit A for $1,700 per month and Unit B for $1,400 per month. We understand that Mr. Whooley has resided in Unit A since 2014 and that he continues to rent out Unit B today.

As you also know, we contend that Mr. Whooley breached the April 16 2014 Investment Agreement in many respects. Among other things, he refused to "accept all reasonable offers." In particular, the Stewards made an offer to purchase the premises in March 2015 at a price that that was in excess of a contemporaneous appraisal, the tax assessed value and the price at which the property was listed in 2014.

As a result of this breach, the Stewards did not receive the rents that should have been paid to them as owners of the premises after March 2015. In the meantime, Mr. Whooley has continued to reside at the premises rent-free and to continue to collect rent from Unit B. The Stewards are entitled to this lost rent as damages.

Thomas F. O'Donnell, Esq.
September 19, 2019
Page 2

Even if we assume no rent increases since 2014 (a particular conservative assumption in today's rising real estate market), this lost rent amounts to at least $3,100 per month for a total lost rent as follows:

| Time Period | Minimum Lost Rent for Period |
|---|---|
| March 2015-December 2015 | $27,900 |
| January 2016-December 2016 | $37,200 |
| January 2017-December 2017 | $37,200 |
| January 2018-October 2018 | $31,000 |
| TOTAL MINIMUM LOST RENT | $133,300 |

As a result, the Stewards damages in this case include: (i) the monies advanced to renovate the property; (ii) the lost rent set forth above; and (iii) M.G.L. c. 231 §6C statutory prejudgment interest of 12% per annum ("In all actions based on contractual obligations, upon a verdict, finding or order for judgment for pecuniary damages, interest shall be added by the clerk of the court to the amount of damages... at the rate of twelve per cent per annum from the date of the breach or demand.").

The total claimed damages are therefore as follows:

| Damage | Amount |
|---|---|
| Renovation Expenses Advanced | $226,354.88 |
| Minimum Lost Rent | $133,300 |
| Statutory Interest March 2015-December 2015 | $30,390.58 |
| Statutory Interest 2016 | $34,854.58 |
| Statutory Interest in 2017 | $39,318.58 |
| Statutory Interest January-October 2018 | $35,965.49 |
| TOTAL DAMAGES | $500,184.10 |

**B. Supplemental Witnesses**

In addition to the witnesses identified in Section 5 of the Joint Pretrial Memorandum, we may also call the following witnesses who have recently come to our attention as a result of materials recently obtained from the Housing Court, Plymouth District Court and Plymouth Probate Court:

Bryan Marcella
53 Foster Ave
Marshfield, MA 02050

Thomas F. O'Donnell, Esq.
September 19, 2019
Page 3

       Donna Marcella
       53 Foster Ave
       Marshfield, MA 02050

       Kelsea McGowan
       Marshfield, MA 02050

       Tyler Judge
       Marshfield, MA 02050

       Robert Valery
       Asst. Director of Public Health
       Town of Marshfield
       870 Morraine Street
       Marshfield, MA 02050

       Matthew Tanis
       380 Tremont Street
       North Dighton, MA 02764

Given that we continue to receive information from third parties, we reserve our rights to supplement this list.

## C. Supplemental Document Production

As you know, we requested these documents in Plaintiffs' First Request for the Production of Documents to Defendant James Whooley, dated February 21, 2017 (*See, e.g.,* Req. Nos. 1, 2, 12). None of the materials concerning the leases, rents, or repairs was produced. Similarly, none of the correspondence with the Town of Marshfield's Board of Health was ever produced. These documents should have been included in your client's document production. Yjey were not. Please review your document requests immediately and confirm, in writing, that you have now produced all responsive non-privileged documents or supplement your document production accordingly.

If you have any questions or concerns, please call me as soon as practicable.

               Very truly yours,

               Matthew N. Kane

MNK/kh